IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:24-MJ-325 |
| | ) | |
| GOKHAN GUN, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' MOTION FOR REVOCATION OF RELEASE ORDER AND REVIEW OF DETENTION

The United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia,  and John T. Gibbs and Anthony J. Rodregous, Assistant United States Attorneys, move this Court, pursuant to 18 U.S.C. §§ 3142 and 3145(a)(1), for a review of Magistrate Judge Ivan D. Davis's release order entered on August 13, 2024. Dkt. 14. The United States requests this Court revoke the release order to ensure the appearance of the defendant at trial and the safety of the community.

The defendant is charged with a serious national security offense:  unauthorized retention of national security materials, in violation of 18 U.S.C. § 1924, which carries a maximum sentence of five years in prison.  As set forth below, over a three-month period, the defendant took numerous steps to obtain classified information, which resulted in a law enforcement investigation which culminated in search warrants for his home, person, vehicles, and devices. On the morning of the execution of the search warrants, the defendant was preparing to leave his home for a scheduled flight to Mexico. A black backpack leaning against the front door to the defendant's residence contained a TOP SECRET document and an intelligence community page showing his security clearances. *See* Compl. Affidavit, ECF No. 2, at ¶ 31. Inside the defendant's home, agents found

stacks of documents containing visible classification markings, including pages bearing TOP SECRET and SCI subcompartment markings, including a document that the defendant was believed to have printed on August 7, 2024. *Id*. at ¶ 34.

Standard of Review

The United States seeks review of the Magistrate Judge's ruling pursuant to 18 U.S.C. § 3145(a)(1). This provision provides that a court with "original jurisdiction over the offense" may review the release order of a magistrate judge. 18 U.S.C. § 3145(a)(1). A review of a detention order is conducted *de novo*. *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989). The United States contends that the defendant should be detained because there are no conditions or combination of conditions that will reasonably assure his appearance and reasonably assure the safety of any other person and the community.

The Court must consider the following factors to determine whether detention is appropriate: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). The United States need only prove flight risk by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). With respect to the risk of harm to the community, the burden of proof is clear and convincing evidence. *See* 18 U.S.C. § 3142(f)(2)(B).

While there is generally a presumption in favor of pretrial release under the Bail Reform Act, "[e]spionage is a uniquely serious crime that generally involves sophisticated defendants with special, and oftentimes unlimited, financial, logistical and intellectual resources to assist in their flight…Not surprisingly then, district courts throughout the country have detained criminal

defendants under similar circumstances." *United States v. Mallory*, 268 F. Supp. 3d 854, 866 (E.D. Va. 2017) (Ellis, J.); *see id.* at 866 n.27 (collecting cases where courts have detained defendants charged with espionage and related offenses).

The District Court's *de novo* review is necessary here, and the defendant should be detained, because of his escalation in removing classified information and attempted trip to Mexico with TOP SECRET materials coupled with his history and characteristics. Based on a careful review of the four factors, there is no combination of conditions that will reasonably assure the defendant's presence at future proceedings or the safety of the community; thus, the magistrate judge's release order should be revoked.

## Basis for Detention

The defendant presents a serious risk of nonappearance and a danger to the community because he methodically and unlawfully removed and retained highly classified documents in the weeks leading up to his international trip and then attempted to remove at least one of those classified documents from the country. The nature and circumstances of the offense show the defendant did not accidentally remove a classified document one time. He systemically brought materials visibly marked as classified home—often, it seems, bundled and obscured by numerous unclassified materials—in the weeks leading up to his trip out of the country. The weight of the evidence includes video recordings from his place of work, his conflicting statements, and the documents recovered from his home and luggage. The defendant also lacks any family ties to the United States, and his only community tie is a girlfriend who, tellingly, agreed to act as a third-party custodian, but refused to commit any of her own resources as part of those duties (refusing to sign an unsecured bond, refusing to post her home as collateral and only offering $1,000 cash to post a bond when she receives in excess of $180,000 annually). *See* Pretrial Services Report,

ECF No. 11, at p. 2.

The defendant also presents a serious risk of nonappearance because his Turkish ties are far more expansive than any of his ties to the United States. He has the financial ability to swiftly exit the United States for unknown destinations. *See* Pretrial Services Report, ECF No. 11, at p. 3-4 (detailing his ownership of at least three homes in northern Virginia, the ownership of three vehicles, and a reported net worth in excess of $1 million). He works in a job that gave him access to a large amount of classified United States government information. Even without the many classified documents that he printed out and unlawfully removed from his workspace, he undoubtedly knows what many of those documents say. Simply by memorizing their contents, he could cause exceptionally grave damage to the United States by revealing that information to our adversaries.

The defendant also presents a danger to the community and a danger to any other person because he previously had access to classified U.S. government information, including information that could "cause exceptionally grave damage to the national security." *See* Executive Order 13526, § 1.2(a)(1). As noted in the criminal complaint affidavit at paragraphs 18-26, in the span of about four months, the defendant printed approximately 256 documents, totaling approximately 3,412 pages. *See* Compl. Affidavit, ECF No. 2, at ¶¶ 18-26.

Given the defendant's willingness to take such exceptional risks in unlawfully retaining classified material, it is clear that if he is released and has the ability to communicate these secrets, it represents a danger to the entire community, as these are espionage offenses that harm the national security of the United States and provide a strategic advantage to our adversaries. Of equal importance is the potential harm to "any other person" consistent with 18 U.S.C. § 3142(e)(1). Given the defendant's past access to classified government documents and the information he

retains in his head, there is a strong likelihood that he possesses information that could reveal the true identities of individuals working for the U.S. government who could be harmed if those identities were revealed. *See* Attach 1, Affidavit of CAPT David Taft. ("If Mr. Gun were to pass that information to an adversary, it would certainly help that adversary develop countermeasures to mitigate identified vulnerabilities and defeat the attack, placing military plans and personnel at risk."). No condition or combination of conditions can overcome these concerns because this sort of information would be very easy to pass to a determined, technically savvy adversary.

Highly classified U.S. government documents can be transmitted instantaneously with a simple key stroke. While the defendant's unusual behavior betrayed him by alerting federal investigators to his illegal activities, investigators may not have enough lead time to prevent another breach in the future. Further, even with restrictions on the defendant's access to technology, the defendant could pass this information to an agent of a foreign government in myriad ways. Through a face-to-face meeting. As part of a brief phone call. Or by having a willing third party pass it on his behalf. Given the close proximity of his residence to Washington, DC, it is not hard to envision that there could be nefarious agents willing and eager to take possession of that information from the defendant.

### i. Nature and Circumstances of the Offense

The nature and circumstances of the instant offense urge detention. Congress recently demonstrated that it views this offense against the United States as particularly serious: In 2018, Congress re-authorized the Foreign Intelligence Surveillance Act, and in so doing increased the maximum term of imprisonment for unlawful retention of classified materials under 18 U.S.C. § 1924 from one year to five years. *FISA Amendments Reauthorization Act of 2017,* Pub. L. 115-118, title II, § 202. Given that the United States Sentencing Commission lacked a quorum from

2019 through 2022, and only amended the sentencing guidelines once after obtaining a quorum, it is no surprise that 18 U.S.C. § 1924 is not keyed to a specific sentencing guideline. This fact notwithstanding, other offenses involving espionage and related offenses carry an increased base offense level under the sentencing guidelines when TOP SECRET materials are improperly gathered, transmitted, or lost. U.S.S.G. §§ 2M3.1 - 2M3.4. In explaining the basis for this heightened base offense level, the applicable policy commentary provides:

> The Commission has set the base offense level in this subpart on the assumption that the information at issue bears a significant relation to the nation's security, and that the revelation will significantly and adversely affect security interests. When revelation is likely to cause little or no harm, a downward departure may be warranted. *See* Chapter Five, Part K (departures).

*Id.* at 2M3.2, App. Note. 2.

Given that Congress deemed unauthorized retention of classified material serious enough to increase the penalty from a misdemeanor to a felony in 2018 and given that analogous offenses involving TOP SECRET material result in a higher sentencing guideline, the nature and circumstances of this offense are quite serious.

Just a few months after obtaining his clearance, the defendant began printing large volumes of unclassified materials, often after most colleagues had left, and walking past security with those rolls of paper. After a few weeks of that behavior, the defendant began incorporating some classified documents into his large-scale printing and removal. The number of classified documents he would print and then apparently remove varied while also increasing. Less than two days before his scheduled international trip, he printed his largest batch of intelligence products, including pages bearing visible TOP SECRET and SCI sub compartment classification markings. Because of that change in behavior immediately before leaving the country, agents obtained residence, vehicle, and person search warrants. Agents executed the search warrants, just as the

defendant was preparing to leave for the airport. He was scheduled to depart the United States on a flight to Puerto Vallarta, Mexico at 6:52 a.m. from Reagan National Airport through Dallas Fort Worth International Airport.

Immediately prior to executing the warrants in this case, the agents observed a ride share service arrive at the defendant's Falls Church residence. Agents watched the defendant exit the Falls Church residence with a trash bag, place it in a trash can, and then begin walking back towards the residence. Agents approached the defendant and observed an orange suitcase next to a vehicle in the driveway. The defendant went with agents to the entry door of the Falls Church residence. There, they observed a black backpack set against the locked door.

An initial search of the backpack found a document marked TOP SECRET, and the defendant's intelligence community clearance page showing his security clearances. In a small belt bag packed for travel, the defendant had his United States passport and an expired passport from Turkey.[1] With regards to the TOP SECRET document found in the defendant's backpack, that document was reviewed by the originating U.S. Government Agency which concluded as follows:

> (U) This document was subsequently reviewed by a U.S. Government Agency with responsibility for its subject matter. I have been informed that an OCA of that agency reviewed it and confirmed that the document was classified as TOP SECRET//SCI. The agency's review further characterized the information in the classified document as National Defense Information pertaining to the U.S. Government's strategy on the research, development, application, and execution of emerging technologies critical to the U.S. national security and defense apparatus.

*See* Attach 2, Memorandum for the Record by Mr. Edwin H. Oshiba.

---

[1] The recovery of the expired Turkish passport is another troubling fact in this case.  While the Defendant would need his U.S. passport to travel to Mexico, an expired Turkish passport would serve no travel purpose.  That he carried both passports in his bag suggests that he may have been attempting to show someone abroad that he was a citizen of Turkey as part of further establishing his bona fides.  It may also have been part of an attempt to renew that passport overseas where the U.S. government would be less likely to find out about it.

During their search of the defendant's Falls Church residence, agents observed stacks of papers in what appeared to be the dining room. Among the papers were multiple documents with visible classification markings, including pages bearing TOP SECRET and SCI sub compartment classification markings. Notably, among the papers found in the Falls Church residence, agents found at least one of the documents marked TOP SECRET that the defendant printed on August 7, 2024. The classifying agency confirmed that document bears TOP SECRET classification markings and continues to reside in that Agency's TOP SECRET reporting repository.

Under Executive Order 13526, information is classified TOP SECRET if its unauthorized disclosure could reasonably result in *exceptionally grave damage* to the national security. The defendant's actions are contrary to the extensive training he received and the detailed nondisclosure agreements he signed.

At the detention hearing, the Magistrate Judge reasoned that detention is inappropriate because this case is similar to other cases involving unauthorized removal and retention of classified documents. *See Transcript of Detention Hearing Proceedings*, 24-mj-00325-IDD-1 (Aug. 13, 2024), at 5. The specific circumstances of this offense are particularly grave, however, because the defendant was preparing to leave the country carrying not only classified documents but also his intelligence community bona fides, which showed his clearance levels. These actions are consistent with the defendant carrying that document in order to demonstrate to a foreign, malign actor that he had access to highly classified, U.S. government secrets. He also carried a second TOP SECRET document along with the list of clearances. In terms of establishing his bona fides, those two documents were ideal. The first showed the type of information he had access to, and the second demonstrated the sort of information that he could produce in hard copy and ferret out of the country. Those two documents would be more than enough to pique the

interest of our foreign adversaries and would establish that the defendant had the ability to deliver more information like that in the future.  So this case is not like many other cases involving unauthorized removal and retention of classified information.

The nature of the offense with which the defendant has been charged is serious on its own; taking this material out of his workplace and storing it at his home, no matter his intent, is a clear violation of 18 U.S.C. § 1924(a). The defendant's pattern of printing after hours and carrying out both classified and unclassified documents suggests that his actions were deliberate and pre-planned. Moreover, the circumstances under which he committed this offense are exponentially grave considering he appeared ready to take at least some of this material overseas for an as-yet unknown purpose. The nature and circumstances of the defendant's alleged crimes reflect a willingness to betray the trust of the Nation. There is no reason to believe that, if released, the defendant will have any greater regard for any trust placed in him by the Court. Thus, this factor militates in favor of his detention.

### ii.   Weight of the Evidence

Congress recognized the seriousness of compromising the security of classified information through substantial criminal penalties, including section 1924. *See* 18 U.S.C. §§ 793, 794. The investigation is ongoing, and given the strength of the case, the United States anticipates that it may file additional charges against the defendant. In fact, as detailed in the Memorandum for the Record at Attachment 2,  the TOP SECRET document concealed in the defendant's backpack has been examined and been characterized as National Defense Information.  That document alone means that the United States could potentially charge the defendant with violating 18 U.S.C. § 793, which carries a significantly higher penalty. The defendant's alleged crime, and the anticipated additional charges, are extremely serious within

the meaning of the Bail Reform Act.

Where the evidence of guilt is strong, it provides a considerable additional incentive to flee. *See United States v. Sheikh*, 994 F. Supp. 2d 736, 742 (E.D.N.C. 2014) (finding that the defendant had a strong incentive to not appear in part because the evidence was strong); *United States v. Mallory*, 268 F. Supp. 3d 854, 863 (E.D. Va. 2017) (Finding at the detention stage of an espionage case that "the weight of the evidence against defendant is significant and substantial, and thus increases the risk that the defendant will flee"). During the detention hearing, the magistrate court seemed to concede that the strength of the evidence was strong. *Transcript of Detention Hearing Proceedings*, 24-mj-00325-IDD-1 (Aug. 13, 2024), at 6.

The Magistrate Judge's assessment was correct.  Law enforcement recovered a great deal of classified material from the defendant's home. He lives alone, making him the sole source of this material illegally removed from a DOD facility. Surveillance videos from his work show him printing out large volumes of paper and then carrying it out of the building. During the search of the defendant's house, he consented to an interview. During that interview he told the FBI that he never took anything classified from his workspace, and that he had no reason to take classified materials to his residences. However, he suggested that, if there were documents with classification markings, the classifications might be expired. Based on the search results, the documents in the defendant's house were not expired.

Knowing himself how much classified information he had stored in his home, the defendant could readily seek to flee the area, go into hiding, or otherwise simply fail to appear at trial. *See United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (holding that the gravity of the offenses and the potential prison term create a considerable incentive for the defendant to avoid prosecution and the likelihood of imprisonment in the event of a conviction).  Moreover,

given the charges that he is facing, the likely loss of his current employment, and his ties to family living overseas, this defendant has a strong incentive to attempt to flee this country. And this does not even take into account the possibility that he is working for a foreign government that would also have a great interest in getting him beyond the reach of the United States. *See United States v. Mallory*, 268 F. 3d 854, 865 (E.D.V.A. 2017) (Detention based on weight of the evidence appropriate where "not only does defendant have the incentive to flee, but he has the skills and contacts to do so successfully and permanently"). Given the strength of the evidence against the defendant, there is no condition or combination of conditions that would reasonably assure the defendant's appearance in court or the safety of the community.

As such, this factor likewise militates in favor of detention.

### iii.   Defendant's History and Characteristics

When contemplating the defendant's history and characteristics under the Bail Reform Act, courts look to the following factors, including "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).[2]

The defendant's history and characteristics illustrate why the Court cannot trust him to abide by its release orders. Just as the defendant would have to promise the Court he would follow conditions set by the Court, the defendant also promised the Department of Defense that he would follow conditions set by the United States to safeguard sensitive compartmented information. He is not charged with accidentally breaking that promise. Rather, within less than a year after gaining

---

[2] Criminal history and related factors as well as drug and alcohol abuse are intentionally omitted from this analysis as the defendant lacks criminal history and the United States has no evidence of the defendant's alcohol or drug abuse.

that trust, he blatantly and repeatedly ignored the serious conditions placed upon him. He was willing to ignore conditions tied to his security clearances and his livelihood despite the threat of prosecution if his actions were discovered. That threat was not enough to deter his actions. There is no reason to believe that he would abide by this Court's conditions of release.

The defendant's lack of candor is also illustrated in his interactions with FBI agents and Court staff after he was confronted with his violations. When he voluntarily spoke with FBI agents after his arrest, he denied ever taking any classified documents from his workplace, which was belied by the classified document in his luggage and the substantial volume of classified documents located inside his home. He also falsely stated that if there were any documents with classification markings in his residences, the classifications might be expired. This is untrue. Furthermore, pretrial services likely found issue with statements made by the defendant, as the report indicated "conflicting financial information" weighed against release. *See* Pretrial Services Report, ECF No. 11, at p. 5. This makes sense given that he failed to identify his Texas or Florida properties to Pretrial, or that he possessed a Turkish bank account. *See*, Pretrial Services Report, ECF No. 11, at p. 4 (where Pretrial Services relied on the criminal complaint affidavit for the information about defendant's out-of-state homes). Notably, he has the financial ability to swiftly exit the United States. *See* Pretrial Services Report, ECF No. 11, at p. 3-4 (detailing a reported net worth in excess of $1 million).

At the detention hearing, the Magistrate Judge improperly compared the defendant's non-disclosure agreement with the United States to non-disclosure agreements signed by NFL players. *Transcript of Detention Hearing Proceedings*, 24-mj-00325-IDD-1 (Aug. 13, 2024), at 12. That analogy woefully understates the seriousness of this offense. A non-disclosure agreement signed by a professional football player, and a non-disclosure agreement signed by a member of our

nation's intelligence community are not the same thing.  The defendant's non-disclosure agreement required him to protect classified information up to TOP SECRET.  Under Executive Order 13526, information is classified TOP SECRET if its unauthorized disclosure could reasonably result in *exceptionally grave damage* to the national security.  Given the seriousness of the information at issue, it is a poor analogy to compare the defendant's conduct to that of a professional athlete. *Cf. United States v. Teixeira*, No. 1:23-cr-10159-IT, 2023 WL 5672758, at *6 (D. Mass. Sept. 1, 2023) (recognizing that the "specific circumstances" of the offense were "of grave concern" where the defendant "signed his name to agreements acknowledging that he understood the seriousness of his security clearance and the potential irreparable injury to the United States that unauthorized disclosure of classified materials could cause" and "then used his training and position to access" and share "hundreds of classified documents").

The defendant also lacks family ties, as he has no family in the United States. His parents both reside in Turkey, and he has traveled to Turkey approximately seven times in the past twenty years, staying between two and six weeks each time. Courts in this district have found that the lack of meaningful ties in the United States weighs in favor of detention. *United States v. Mitchell*, Criminal Action No. 1:23-mj-157 (RDA), 2023 WL 5438156, at *5 (E.D. Va. Aug. 23, 2023) (citing *United States v. Vasquez Molina*, 588 F. Supp. 2d 1,2 (D.D.C. 2008) (ordering defendant detained where, "the defendant has no prior criminal history but has no ties to the United States.")).

The defendant likewise lacks meaningful community ties, as all he can muster on this score is a girlfriend who resides in Reston. This girlfriend was identified as a third-party custodian, but as previously noted, when asked whether she was willing to post a bond, she indicated that she was unwilling to post her home as collateral, unwilling to sign an unsecured bond, and would only post $1,000 towards the defendant's bond, despite receiving approximately $180,000 annually in

13

child support and alimony. Although the defendant does possess property in this district, this fact in concert with his girlfriend are not tantamount to a community tie that defeats the weight of his flight risk.

Beyond his girlfriend, Pretrial Services also interviewed an individual in Texas identified as a "longtime friend" of the defendant's. While this individual does not reside in the community, he was offered as a potential third-party custodian. Yet much like the girlfriend, this individual advised that he "is not willing to sign an unsecured bond, is not able to post a cash bond, and is not willing to offer his residence as collateral." *See* Pretrial Services Report, ECF No. 11, at p. 2-3. In terms of evaluating the defendant's history and characteristics, it is telling that two of the people who know the defendant best are unwilling to jeopardize any of their personal assets while acting as his third-party custodian. If the two people who know the defendant best do not have more faith in him than that, it is difficult to see how this Court can be satisfied that the defendant will follow the Court's instructions should he be released.

The defendant has not only the incentive to flee, but also the ability to do so. He has taken fifteen international trips in the past twenty years, including trips to Turkey, where he was born. *See* Compl. Affidavit, ECF No. 2, at ¶ 13. Indeed, he was on his way out of the country on the morning that the search warrants were executed. *See id.* ¶¶ 28–30. He has dual citizenship with Turkey and an expired Turkish passport, with which he apparently still travels. *See id.* ¶¶ 12, 32.

The defendant's history and characteristics weigh in favor of detention, as no condition or combination of conditions can overcome his dishonest character, extensive overseas family ties, lack of ties to the country let alone community, and his financial ability to flee and avoid punishment in this case.

iv.  **Danger to the Community**

14

The defendant is employed as a civilian employee by the Department of Defense and works at the Joint Warfare Analysis Center (JWAC), whose mission according to its Commander, U.S. Navy Captain David Taft, is to "provide[] the Department of Defense with innovative solutions to target adversary critical infrastructures and related systems. It does so through the unique integration of intelligence data, deep subject expertise, and specific modeling & simulations." *See* Attach 1, Affidavit of CAPT David Taft.

Even without the many classified documents that he printed out and unlawfully removed from his workspace, the defendant poses an exceptionally grave danger to the United States if he were to be released.  The risk to this country if he successfully flees or transmits the information to which he had access to a determined, technically savvy adversary is immense. As CAPT Taft noted, if the defendant discloses his personal knowledge, it could "cause catastrophic loss of sensitive technologies, negatively impact sensitive military operations, and undermine years of associated research and development that has been focused on the nation's hardest problems."  *Id*.

If released, the defendant poses an unacceptable threat to the public. On or about September 25, 2023, as part of his responsibilities with DOD, the defendant signed a Classified Information Nondisclosure Agreement. Additionally, on or about December 12, 2023, the defendant signed a Sensitive Compartmented Information Nondisclosure Agreement. Both agreements provide, in part, that unauthorized disclosure of classified or Sensitive Compartmented Information may violate U.S. law, including Title 18, United States Code, Sections 793 and 794. Despite those acknowledgements, the defendant chose to violate his duty to protect classified information, and, in fact, he took a great deal of impermissible material out of his workspace in violation of the law. And critically, the evidence to date shows that he began to remove this material only five months after he had signed the Sensitive Compartmented Information Nondisclosure Agreement.  *See*

Compl. Affidavit, ECF No. 2, at ¶ 18.  This begs the question as to whether he intended to unlawfully remove classified information from the moment that he signed his non-disclosure agreement.  Yet regardless of his intent at that time, once he began to print and remove classified material from his DOD workspace, he violated U.S. law.

Courts have held in other cases that defendants who violate their commitments to protect classified information should be detained as a danger to the community.  In *United States v. Teixeira*, No. 1:23-CR-10159-IT, 2023 WL 5672758, at *8 (D. Mass. Sept. 1, 2023), the Court determined that "based on the evidence the government ha[d] proffered that [the defendant] ha[d] disregarded his solemn written commitments and been willing to state what is necessary to serve his own interests," the district court found no "basis to trust a commitment here to follow court orders."  Because "the pretrial release system depends, in part, on a court's belief that defendants will keep their word," release was not appropriate for a defendant who broke his commitments to the United States. *Id.*  Similarly, in *Mallory*, Judge Ellis concluded that the danger to the community weighed in favor of detention because if the defendant were to flee, "he could pose the gravest of risks to American assets abroad and citizens here at home." 268 F. Supp. 3d at 865. Judge Ellis emphasized that the defendant "possesse[d] sensitive information . . . that could cause harm to clandestine intelligence sources, to say nothing of the grave danger facing the agencies themselves and the United States as a whole." *Id.*

The government continues to actively work to recover any materials the defendant unlawfully removed. However, the defendant had access to classified material whenever he was at his workspace, and it is possible that he has hidden or memorized classified information that could be very valuable to our foreign adversaries. If the defendant were to be released, there is no

condition of pretrial confinement that would assure that he would not successfully reveal that information to other bad actors.

These facts paint a grave picture of the threat the defendant poses to the American public. His willingness to violate his nondisclosure agreements in such a blatant fashion demonstrates that he has no compunction about improperly handling material that has the potential to cause grave damage to America's national security. It is clear that there is no condition or combination of combination of conditions that can sufficiently mitigate the risk that the defendant poses to the community.

**v.     Nature and Seriousness of Danger to Any Person or the Community**

As noted previously, this defendant poses a danger to the community writ large, to the United States Government, and to others.  Violations of 18 U.S.C. § 1924 are infrequently prosecuted.  Hopefully,  this is due, in part, to the fact that people entrusted with our government's secrets rarely seek to betray their country.  Significantly, in this cyber age, such offenses are exceedingly difficult to detect and are very serious because of the harm that they can cause to our national security and our foreign relations.

These charges are also serious because people who willingly choose to serve their country to protect the nation from our adversaries know that they do so at great personal risk.  The government does not know with certainty how much more classified information this defendant has stolen.  The government also does not know what information he has in his head about specific government programs but based on his access to classified information and the nature of his employment, it is highly likely to be significant. What the government does know is that information would be incredibly valuable to our adversaries. The Pretrial conditions of release are simply not sufficient to ensure the safety of any other person or the community.

The defendant has demonstrated a willingness to retain classified documents inside his home, and a willingness to lie to Agents investigating his crimes and to omit information from Pretrial Services. The defendant faces an overwhelming amount of evidence against him.  He has every reason to flee, and he has access to an unknown amount of foreign funds through a Turkish bank account that he did not disclose to Pretrial Services. With the potential backing of a foreign power, there is no guarantee that the defendant will return to court should he be released.  Further, there are no conditions this Court could impose that can sufficiently prevent the transfer of the highly sensitive national security information that the defendant has memorized, or that has not been recovered by the FBI.

In sum, the United States maintains that a preponderance of the evidence supports the conclusion that no condition or combination of conditions can reasonably assure the defendant's attendance at future proceedings, and clear and convincing evidence supports the conclusion that his release would endanger the community.

<u>Judicial Basis for Release with Conditions</u>

As to The Magistrate Judge's decision to release the defendant, he concluded release was appropriate after noting "the lack of any factual information . . . from which th[e] Court could conclude that Mr. Gun did anything at this juncture but to have unauthorized or removed without authority and retained classified material, the lack of any criminal history, the fact that he has a third-party custodian." *Transcript of Detention Hearing Proceedings*, 24-mj-00325-IDD-1 (Aug. 13, 2024), at 37.

As detailed above, the specific circumstances of this offense involve more than simple retention of classified documents, since the defendant was attempting to carry one of the TOP SECRET documents out of the country. Moreover, the third-party custodian, the defendant's

girlfriend, does not provide sufficient assurance of the defendant's appearance at trial and the safety of the community. Specifically, the Magistrate Judge did not set a secured bond, and courts in this district have recognized that the lack of direct consequences for a third-party custodian removes the "moral suasion that a third-party custodian is supposed to provide." *Mitchell*, 2023 WL 5438156, at *6 (citing *United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001). Additionally, the third-party custodian is the sole caregiver for a family member facing a serious medical condition that requires substantial medical treatment.  This obligation requires her to be outside of the home for multiple appointments each week. *See* Pretrial Services Report, ECF No. 11, at p. 2. If circumstances were to change for the worse, her ability to monitor and influence the defendant may significantly decrease. As such, she is ill-suited to serve as a third-party custodian.

Further, the conditions of release do not mitigate the defendant's serious risk of flight. First, relinquishing international travel documents does not reduce the risk of international flight, as the defendant is a Turkish citizen and could petition his country's assistance. Second, as other courts have recognized, "location monitoring is inadequate because ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee." *United States v. Wang*, No. 23 CR. 118-3 (AT), 2023 WL 4551637, at *3 (S.D.N.Y. July 14, 2023) (citing *United States v. Freeman*, No. 21 Cr. 88 (S.D.N.Y.), Bail Hr'g 5:4-6, Feb. 19, 2021. ECF No. 50 ("Anyone who knows the technology of electronic monitoring knows that it is far from foolproof."), *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (stating that electronic monitoring "at best ... limits a fleeing defendant's head start")) *and United States v. Hir,* 517 F.3d 1081, 1092 (9th Cir. 2008) ("Although these proposed conditions of release are strict, they contain one critical flaw.  In order to be effective, they depend on Abd Hir's good faith compliance."). As such, location monitoring merely provides notice of, and does little to prevent,

flight.

Conclusion

The United States respectfully requests that this Court revoke the release order.  The United States submits that continued detention of the defendant pending trial in this matter is the only reasonable condition to assure his next appearance and the safety of others, including the United States at large, due to the national security risk he presents if released.  A hearing on this matter is respectfully requested.

Respectfully submitted,

JESSICA D. ABER
United States Attorney

By:     _____/s/_____
John T. Gibbs
Anthony J. Rodregous
Assistant United States Attorneys
Office of the United States
Attorney 2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299 3981
Email: john.gibbs@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of August 2024, I filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send an electronic notification to all counsel of

record.

_____/s/_____
John T. Gibbs
Assistant U.S. Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
(703) 299-3981 (fax)
Email: john.gibbs@usdoj.gov

21