```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3
     UNITED STATES OF AMERICA,        :
 4                                    :
                 PLAINTIFF,           :   Criminal Action
 5                                    :   No. 1:24-mj-00325-IDD-1
          v.                          :
 6                                    :
     GOKHAN GUN,                      :   August 13, 2024
 7                                    :   2:11 p.m. - 2:55 p.m.
                 DEFENDANT.           :
 8                                    :
                                      :
 9                                    :
     ............................:
10

11            TRANSCRIPT OF DETENTION HEARING PROCEEDINGS
                 BEFORE THE HONORABLE IVAN D. DAVIS,
12                UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For the United States:   UNITED STATES ATTORNEY'S OFFICE
                              Anthony James Rodregous, AUSA
15                            John T. Gibbs, AUSA
                              2100 Jamieson Avenue
16                            Alexandria, VA 22314

17   For the Defendant:       PRICE BENOWITZ LLP (DC)
                              Rammy George Barbari, Esquire
18                            409 7th Street NW
                              Suite 200
19                            Washington, DC 20004

20   Court Reporter:          Diane Salters, B.S., CSR, RPR, RCR
                              Official Court Reporter
21                            United States District Court
                              401 Courthouse Square
22                            Alexandria, VA 22314
                              Email: Dianesalters.edva@gmail.com
23                            Telephone: (301) 338-8033

24   Proceedings reported by machine shorthand from an FTR Gold
     recording.  Transcript produced by computer-aided
25   transcription.
```

1              THE COURTROOM DEPUTY:  *United States of America v.*

2    *Gokhan Gun*, Case Number 24-mj-325.

3              MR. RODREGOUS:  Good afternoon, Your Honor.  Anthony

4    Rodregous and John Gibbs for the United States.

5              THE COURT:  Good afternoon.

6              MR. BARBARI:  Good afternoon, Your Honor.  Rammi

7    Barbari on behalf of Mr. Gibbs, who is walking in.

8              THE COURT:  Good afternoon.

9              This matter is scheduled before the Court for a joint

10   preliminary and detention hearing.  Are the parties ready to

11   proceed?

12             MR. RODREGOUS:  Yes, Your Honor.

13             MR. BARBARI:  Yes, Your Honor, we are.  What I can

14   tell the Court, just briefly, is we're going to waive the

15   preliminary hearing and just move forward on the detention

16   hearing.

17             THE COURT:  All right.  Has he executed a waiver?

18             MR. BARBARI:  We have not, Your Honor.

19             THE COURT:  Based on the representations of counsel,

20   as well as the information that's contained in the affidavit in

21   support of the criminal complaint, the Court finds that

22   probable cause exists for the allegations as set forth in the

23   complaint.  The matter will be referred to the grand jury for

24   further proceedings.

25             In regards to detention, is the government intending

*Proceedings*

1    to call any witnesses, are you proffering any evidence, or are

2    you just proceeding based on the affidavit, the complaint, and

3    the Pretrial Services Report?

4            MR. RODREGOUS:  The United States would proffer two

5    pieces of evidence, Your Honor:  First, that the defendant owns

6    property in Texas, that agents discovered information to

7    corroborate this fact, as well as the fact that he maintains a

8    Turkish bank account.  Those are the only two facts we wish to

9    proffer, Your Honor.  We would otherwise proceed in argument.

10           THE COURT:  Well, you may proceed.

11           MR. RODREGOUS:  Thank you, Your Honor.

12           Although pretrial release is the norm, this is not a

13   normal case.  Classified material in this country is

14   safeguarded, and for good reason.  It's not entrusted to

15   anybody who simply asks for it, and that is because there is a

16   very real probability that if classified material is released

17   to our adversaries, it threatens our soldiers, our diplomats,

18   our agents overseas and, quite frankly, represents a very real

19   threat to American citizens at home.  And it is with this idea

20   in mind, in concert with the fact that all four factors that

21   this Court considers under the federal format, 18 U.S.C.

22   § 3142(g), all counsel detention.

23           To my first point, the nature and characteristics of

24   this offense, Defendant is charged under 18 U.S.C. § 1924,

25   which punishes the unauthorized retention of classified

1    material.  Your Honor, this isn't an instance where we have an

2    unwitting participant who makes a mistake and brings a few

3    documents home.  As the complaint made clear, from May to

4    August, the defendant was engaged in the process of obtaining

5    classified material.  And when encountered at his home Friday

6    morning before leaving the United States on a trip to Mexico,

7    it was discovered that he had classified material on his

8    person, in his home, and, moreover, he had a printout

9    containing his Intelligence Community *bona fides*.  It seems to

10   not be an inferential leap, Your Honor, that that document

11   would be presented to an individual outside of the United

12   States for a less-than-proper purpose.

13        This charge carries a five-year statutory maximum term

14   of imprisonment.  And it is also worth noting, Your Honor, that

15   the sentencing guidelines, under Part 2M, when contemplating

16   espionage and other national security offenses, have a carveout

17   for instances where Top Secret material is involved.  That is

18   exactly what's at stake here.

19        THE COURT:  Involved how?

20        MR. RODREGOUS:  If the individual is disclosing -- so

21   let me be clear, Your Honor:  Section 1924 was made a felony in

22   2018.  Since that point, the guidelines have not included that

23   because of their lack of quorum.  So in the guidelines, you

24   have 793 and other offenses.  And so, at best, we can look to

25   other national security offenses, but each of those enumerated

*Proceedings*

1    offenses within the guidelines have a base offense level and a

2    heightened level when Top Secret material is at stake.

3                THE COURT:  So what makes this different, factually,

4    from any other charge of unauthorized removal and retention?

5                MR. RODREGOUS:  Your Honor, because at this time, this

6    investigation is still ongoing.

7                THE COURT:  Well, you're asking for detention now, so

8    you have to prove to the Court now that detention is the

9    appropriate course of action.  So in proving to this Court that

10   it is, you must answer this Court's question:  What makes this

11   different, factually, from any other individual charged with

12   unauthorized removal and retention of classified material under

13   18 U.S.C. § 1924?

14               MR. RODREGOUS:  That, in this instance, when he was

15   apprehended, he had the ability and documents that could be

16   presented to another that would constitute a much more serious

17   offense.

18               THE COURT:  That's every case of unauthorized removal

19   and retention, almost, because that's the only way you know

20   that they retained something without authorization, is because

21   you find it either on their person or their home.  So that's

22   every case.  So, factually, once again, what differentiates

23   that factually from any other defendant charged with the exact

24   same offense?

25               MR. RODREGOUS:  In his possession were his

*Proceedings*

1   Intelligence Community *bona fides*, which is a printout showing

2   what his clearance level was, Your Honor.

3          THE COURT:  I think he knows what his clearance level

4   is, so what does that have to do with anything?

5          MR. RODREGOUS:  Because that is what goes into my next

6   point of the strength of the case, Your Honor, in that it is a

7   very high likelihood --

8          THE COURT:  Okay.  Let's say this case is very strong,

9   very strong; is it a presumption case?

10          MR. RODREGOUS:  It is not, Your Honor.

11          THE COURT:  There's a reason for that, right?

12   Congress didn't think it was appropriate that these types of

13   cases should come with a rebuttable presumption.  You seem to

14   be arguing a rebuttable presumption simply because of the

15   offense itself.  Congress made clear that it did not intend for

16   a rebuttable presumption.  You have not provided this Court, as

17   of yet, any information that would differentiate, factually,

18   this case from any other case that involves the same charge --

19          MR. RODREGOUS:  Well, that's why --

20          THE COURT:  -- so what does your extra serious

21   argument come from if his conduct, essentially, is

22   substantially identical or similar to similar charges?

23          MR. RODREGOUS:  Your Honor, by the -- given that I'm

24   going to argue all four points, I believe that the Court's

25   questions will be satisfied as I get to the fourth component,

*Proceedings*

1  which is the dangerousness that this individual reflects.  And

2  I will endeavor to ensure that the question that this Court --

3          THE COURT:  Well, if that's your most important point,

4  let's move it to the top of the list and argue it now.

5          MR. RODREGOUS:  Absolutely, Your Honor.  So it is

6  clear that the defendant unlawfully possessed classified

7  material.  It's also clear who his employer was, Your Honor.

8  And in this case, Mr. Gun was employed by the Department of

9  Defense, and his day-to-day employment was at the Joint Warfare

10  Analysis Center.  The mission of that center is -- and if

11  you'll bear with me, I'd like to read it for precision sake --

12  it is "to provide combatant commands, Joint Staff, and other

13  customers with effects-based analysis and precision targeting

14  options for selected networks and nodes in order to carry out

15  the national security and military strategies of the United

16  States during peace, crisis, and war."

17          Your Honor, this is the exact type of material that

18  our adversaries would love to get their hands on.

19          THE COURT:  How do I know?  You haven't explained to

20  me what the material was except for the fact that it's

21  classified.

22          MR. RODREGOUS:  And that, unfortunately, Your Honor,

23  is a position we have to persist in given that we can't go

24  into --

25          THE COURT:  But Congress --

*Proceedings*

1          MR. RODREGOUS:  -- the specifics.

2          THE COURT:  -- determined it was not appropriate to

3   make it a presumption case.  You seem to continue to be arguing

4   that because of the type of case, he should be detained.  That

5   would be an argument of rebuttable presumption.  Congress made

6   it clear that it did not intend for a rebuttable presumption to

7   apply to this type of case.

8          So, once again, what's so serious about this case

9   other than the fact that it involves classified material?

10  Because if it didn't, you wouldn't have any charge against this

11  defendant.  So besides that, what is so significant about his

12  conduct -- not the information in general -- his conduct in

13  relation to said documents that would make him a serious danger

14  to the community, and not just a serious danger to the

15  community, but a danger that cannot be addressed by conditions

16  of this Court?

17         MR. RODREGOUS:  Your Honor, the other fact that weighs

18  in contrast to some of the other cases is the sheer volume of

19  what Mr. Gun is alleged to possess.

20         THE COURT:  I have no chart in front of me that

21  compares the volume of documents that were, I guess, acquired

22  during the search of Mr. Gun and/or his residences compared to

23  the amount of documents acquired in a search concerning any

24  other case.

25         MR. RODREGOUS:  Respectfully, Your Honor, I don't

1    believe it's the general practice that we would make a

2    comparison of the defendant --

3              THE COURT:  No, but your argument is the amount of

4    documents.  How do I know that the amount of documents here

5    makes this defendant more dangerous?  Because I have nothing to

6    compare.  Three thousand and something pages of documents, how

7    do I know that's a lot? because I have nothing to compare it

8    with.  Other defendants could have been charged with 20,000

9    pages of documents, which would make Mr. Gun's retention pale

10   in comparison.

11             MR. RODREGOUS:  Your Honor, I think the important

12   distinction here is it need not be a presumption nor for me to

13   present it as such --

14             THE COURT:  I didn't say it had to be, but I'm still

15   trying to get from you what information about this case makes

16   it different than any other case in which the defendant is

17   charged with the exact same offense; because if not, your

18   argument then is anyone who's charged with this offense is

19   seriously dangerous, the evidence is strong against them, and,

20   therefore, they should be detained, which is a presumption

21   case.

22             MR. RODREGOUS:  Your Honor, the argument is that the

23   classification of these documents being a TS represents

24   documents that have a reasonable likelihood to cause

25   exceptionally grave harm to the United States.

1          THE COURT:  If provided to a foreign actor.

2          MR. RODREGOUS:  And if --

3          THE COURT:  Do we have any information during this

4    investigation that Mr. Gun provided any of this documentation

5    to a foreign actor, any information that would suggest his

6    intent to provide said information to any foreign actor?

7          MR. RODREGOUS:  That's the relevance of the IC

8    credential on his person, Your Honor.  When he was apprehended,

9    before he was prepared to get on a flight out of the United

10   States with classified material --

11         THE COURT:  No, no, that's not my question.  My

12   question is:  Has this investigation uncovered any

13   dissemination of this classified information from Mr. Gun to

14   any third party?  Has it uncovered Mr. Gun's intent to divulge

15   or disseminate any of this information to any third party?

16         MR. RODREGOUS:  Your Honor, I'm not prepared to answer

17   that question in this forum presently --

18         THE COURT:  Then, to this Court's --

19         MR. RODREGOUS:  -- because of the security.

20         THE COURT:  -- conclusion, it's no; and, therefore,

21   your argument that it's the type of information that would is

22   quite clearly understood by this Court -- any classified

23   information is -- but that does not reach the conclusion that

24   anyone charged with the retention of classified documentation,

25   just based on the charge itself, should be detained.  You have

1    to specify the particulars about this case that make detention

2    appropriate, not the generalities.

3           MR. RODREGOUS:  And that's why I have other factors to

4    illustrate to the Court --

5           THE COURT:  Well, then let's --

6           MR. RODREGOUS:  -- alternative reasons.

7           THE COURT:  -- get to them more expeditiously.

8           MR. RODREGOUS:  Got it, Your Honor.

9           As to the history and characteristics of the

10   defendant, Your Honor, when he received access to sensitive

11   compartmentalized information, he, like everyone else, executes

12   a form with the United States -- it is a 4414 -- and,

13   Your Honor, that document is an agreement between the United

14   States and an individual who is set to receive SCI material

15   that there is special trust placed in them.  Your Honor, the

16   word "trust" appears in this document three times.  And at the

17   tail end of the very first paragraph, it provides, quote [as

18   said]:  I understand and accept that by being granted access to

19   SCI, special confidence will be placed in me by the United

20   States Government.

21          The very first factor in the history and

22   characteristics that this Court will look to under 3142(g)(3)

23   is the individual's character.  And, Your Honor, it's quite

24   clear that Mr. Gun's character is a veracity for telling far

25   less than the truth.  He entered into an agreement with the

1    United States that he would properly safeguard classified

2    material.  He indicated, when he was interviewed by Pretrial

3    Services, that he would never disclose classified material.

4    Your Honor, the facts do not --

5            THE COURT:  And, once again, unless you have some

6    information that would suggest that he had disseminated it or

7    intended to disseminate it, how can you conclude that his

8    representation to Pretrial Services that he would never

9    disclose it is inaccurate?

10           MR. RODREGOUS:  Your Honor, because safeguarding does

11   not mean distribution.  Safeguarding means that it is not --

12           THE COURT:  And where was it found?

13           MR. RODREGOUS:  -- to be taken from a facility.

14           In his home, Your Honor, where it should not have

15   been.

16           THE COURT:  And that's the only reason you have the

17   charge against him, but that doesn't make his conduct any more

18   egregious than anyone else charged with the same offense.

19           MR. RODREGOUS:  Respectfully --

20           THE COURT:  Everyone charged with this offense, based

21   on their position, has probably signed a nondisclosure

22   agreement.  Members of NFL teams are required to sign

23   nondisclosure agreements.  Much of the information they come in

24   contact with has absolutely nothing to do with harming the

25   team's performance on the field on Sunday.

*Proceedings*

1          MR. RODREGOUS:  Respectfully, Your Honor, I think the

2    comparison of a football player to someone whose information,

3    if disclosed, can cost American lives is not --

4          THE COURT:  If disclosed.  If you had information that

5    suggests it was disclosed or he intended to disclose it, then

6    the severity of his conduct would be more significant in the

7    Court's viewpoint.

8          MR. RODREGOUS:  I understood Your Honor --

9          THE COURT:  But you do not have that.  So what else

10   about this case, once again, differentiates it from the typical

11   case that involves this charge?

12         MR. RODREGOUS:  See, Your Honor, the nature and

13   circumstances of this case are one of four factors, and I've

14   moved from his individual character, and that's what I've --

15         THE COURT:  The only thing you said about personality

16   is that he may have a tendency to lie because, obviously, he

17   did so when he signed the nondisclosure agreement.  How do you

18   know at the time he signed the nondisclosure agreement that he

19   intended to disseminate or retain, without authorization,

20   classified information?  Because if he didn't, and he acquired

21   that intent at a later point in time when he signed the

22   nondisclosure agreement, he was not lying; he was telling the

23   truth.

24         MR. RODREGOUS:  Your Honor, the point is not what was

25   in his head at the moment he signed it --

*Proceedings*

1          THE COURT:  What is your point?

2          MR. RODREGOUS:  The point is that he was bound by that

3    agreement and he violated it.

4          THE COURT:  We're bound by the law.  This courtroom,

5    this courthouse exists because people violate it.

6          MR. RODREGOUS:  And that's why --

7          THE COURT:  That in and of itself is insufficient to

8    detain.

9          MR. RODREGOUS:  And that's why it's the sum of all

10   four factors --

11         THE COURT:  Well --

12         MR. RODREGOUS:  -- and I'm happy to proceed.

13         THE COURT:  Then move on to the next factor.

14         MR. RODREGOUS:  He also lied to Pretrial Services.  He

15   lied to our agents when he said --

16         THE COURT:  What did he lie to Pretrial Services

17   about?  Because the only thing I've heard so far is a statement

18   to Pretrial that he would never disclose classified

19   information.  You have no evidence that he did, so how is that

20   statement inaccurate?

21         MR. RODREGOUS:  He also failed to indicate that he --

22         THE COURT:  No, no, no --

23         MR. RODREGOUS:  -- owns property in Texas.

24         THE COURT:  -- there's a question pending on the

25   table:  How is that representation inaccurate?

*Proceedings*

1      MR. RODREGOUS:  It wasn't that he would never

2  disclose; it's that he would never take it home, Your Honor,

3  and that's --

4          THE COURT:  Is that what he --

5          MR. RODREGOUS:  -- exactly what he did.

6          THE COURT:  -- told Pretrial Services; he would never

7  take it home?

8          MR. RODREGOUS:  When he spoke --

9          THE COURT:  I doubt it seriously because, generally

10  speaking, Pretrial Services does not address the offense in

11  their interview with the defendant.

12          MR. RODREGOUS:  It was Pretrial Services and our

13  agents, Your Honor.  To Pretrial Services, he omitted --

14          THE COURT:  Oh, now it's your agents.

15          MR. RODREGOUS:  -- property ownership.

16          I did say both, Your Honor.  It was property ownership

17  to Pretrial Services; and when interviewed by our agents after

18  his apprehension --

19          THE COURT:  What do you mean property ownership to

20  Pretrial Services?

21          MR. RODREGOUS:  He was asked if he owned property,

22  Your Honor, and he did not include that he owns property in

23  Texas.  And his potential third-party custodian, his long-term

24  friend in Texas indicated --

25          THE COURT:  Well, I've read several things that it

*Proceedings*

1    appears that Mr. Gun owns a lot of property.

2             MR. RODREGOUS:  And Pretrial Services --

3             THE COURT:  Did he divulge other property?

4             MR. RODREGOUS:  He did, but --

5             THE COURT:  And so is it not possible that failure to

6    disclose a Texas property was a mistake or an omission?

7             MR. RODREGOUS:  Well, Your Honor, Pretrial Services --

8             THE COURT:  Do you have any information in your

9    possession that the nondisclosure of the Texas property was

10   done intentionally; and if so, for what purpose?

11            MR. RODREGOUS:  Your Honor, it's our conclusion, as

12   well as the conclusion of Pretrial Services, that he provided

13   conflicting information, so I'm not --

14            THE COURT:  And --

15            MR. RODREGOUS:  -- manifesting --

16            THE COURT:  -- Pretrial Services, with said

17   information in its possession, has recommended release.

18            MR. RODREGOUS:  And that's --

19            THE COURT:  You can't have it both ways.  You can't

20   say I agree with Pretrial Services but disagree with Pretrial

21   Services.

22            MR. RODREGOUS:  Well, I can adopt -- some of their

23   conclusions may not necessarily support the final, Your Honor,

24   but I'm providing that to say that this isn't just the position

25   the United States is offering.

*Proceedings*

1              And to the other points, he has no family ties in this

2      area.  His family lives in Turkey.

3              THE COURT:  And where in the statute or regulations

4      does it say that contact requires that contact to be local with

5      the court in which he is to be charged and/or prosecuted?

6              MR. RODREGOUS:  Under 3142(f) -- excuse me -- (g)(3),

7      Your Honor, this Court is to consider his family ties, and it

8      seems that those ties would need to be limited to the district

9      that the Court sits because --

10              THE COURT:  What do you mean "it seems"?  There's no

11      such thing as "it seems" in the law.  There either is law that

12      says that's the case or not.  What is your position?

13              MR. RODREGOUS:  Family ties --

14              THE COURT:  Do you have legal authority for the

15      position that the Court should consider detention more likely

16      if an individual does not have a residence in the district in

17      which he is charged and to be prosecuted?

18              MR. RODREGOUS:  The district courts in this

19      district --

20              THE COURT:  Do you have any legal authority for the

21      statement just made by this Court?

22              MR. RODREGOUS:  I have authority for cases decided in

23      this district where the district court found that no local ties

24      and only ties overseas were insufficient to meet that prong.

25              THE COURT:  Only ties overseas.  He owns property

1    here.  How is that not ties to this district?

2            MR. RODREGOUS:  Because I'm discussing family ties,

3    Your Honor, not community residence or community ties, which

4    are separate inquiries, so --

5            THE COURT:  So he --

6            MR. RODREGOUS:  -- his family ties.

7            THE COURT:  -- has no family or friends in Virginia or

8    in the United States of America?

9            MR. RODREGOUS:  Respectfully, Your Honor, the statute

10   says "family ties," not friends.  Everybody has friends,

11   Your Honor.

12           THE COURT:  He has no family ties in the Eastern

13   District of Virginia or in the United States?

14           MR. RODREGOUS:  In this district, that is correct,

15   Your Honor, he does not.

16           THE COURT:  Or in the United States?

17           MR. RODREGOUS:  By what we have in front of us, he has

18   no family in the United States.  He has no children.  He was

19   divorced in 2014, so there's no spouse to speak of, and he has

20   no ties.  And as I've --

21           THE COURT:  So now you have one factor that may weigh

22   in your favor.

23           MR. RODREGOUS:  As to the community --

24           THE COURT:  We've discussed three.  You have one that

25   may be in your favor.

1          MR. RODREGOUS:  Well, you did say that the strength of

2    the case was strong, Your Honor, so I think we have two.

3          THE COURT:  All right.

4          MR. RODREGOUS:  As to the community ties, at which the

5    Court alludes, he has a girlfriend here, and she has indicated

6    that -- when asked if she would serve as a third-party

7    custodian, she provided her financial background and indicated

8    that she makes -- she receives a substantial sum in alimony and

9    child support from a previous marriage, but was unwilling to

10   provide her residence as collateral, and only indicated that

11   she was prepared to provide $1,000 towards his bond.

12         THE COURT:  And what does that have to do with this

13   individual and whether he presents a risk of nonappearance or

14   danger to the community, whether or not a potential third-party

15   custodian wants to possibly lose her home if he doesn't do

16   something in the future?

17         MR. RODREGOUS:  Well, it's relevant, Your Honor,

18   because in this case, Pretrial is recommending -- the two run

19   together.  The community tie is also the individual who would

20   serve as a custodian.  And I can separate those two if the

21   Court prefers, but I think, for the sake of expediency, it

22   would be better to analyze them together.  And that conclusion

23   results in an individual who is not really willing to accept

24   much risk, but be a third-party custodian.  And the district

25   court here in the United States against --

1        THE COURT:  If the Court had to venture an estimate,

2    the probability is the majority of third-party custodians would

3    not prefer to offer their homes as collateral.  So, once again,

4    that fact doesn't place Mr. Gun in any different position in

5    front of this Court than any other defendant, almost.

6        MR. RODREGOUS:  In *United States v. Mitchell*,

7    Your Honor, a district court in this district held that a

8    custodian who doesn't incur any risk --

9        THE COURT:  It doesn't make a difference.  We are

10    different.  We're taught to be different, who we are, and make

11    our own determinations on probable cause and detention

12    irrespective of what another judge may have done unless, of

13    course, that information or that court case is defined as

14    precedent.

15        MR. RODREGOUS:  Understood, Your Honor.  It is a -- I

16    note it for the fact that it is a case from a district court

17    here, and this isn't an abstract analysis from a foreign court

18    outside of this district.

19        THE COURT:  And the facts of that case are

20    substantially identical to the facts of this case?

21        MR. RODREGOUS:  They are in the sense for the

22    proposition of analyzing the proprietary of a third-party

23    custodian.

24        THE COURT:  Not for the proposition; it has to be in

25    toto or that case makes no difference to this Court on why it

*Proceedings*

1    should rule a certain way if even the facts of that case are

2    different, because that court, in all likelihood, based its

3    decision on all the factors required to consider as well, the

4    same way this Court is required to do so.  And if the facts of

5    the case were substantially different, obviously, the

6    determinations by the two courts, it would serve to believe

7    that those decisions would be different.

8              MR. RODREGOUS:  Understood, Your Honor.

9              Turning to the other component of the third-party

10   custodian, the defendant's girlfriend seems ill-suited for the

11   task for reasons --

12             THE COURT:  Put her aside.  So if we had any issue --

13   or the Court had any issue with that individual as a

14   third-party custodian, what's the problem with just getting

15   another third-party custodian?

16             MR. RODREGOUS:  The other identified third-party

17   custodian, Your Honor, is located in Texas; and if the Court

18   was inclined to send Mr. Gun to Texas subject to that

19   custodian, he would be placing him closer to Mexico, the

20   country that the defendant was attempting to enter with

21   classified material on his person.  For those reasons, that

22   custodian is inappropriate as well.

23             THE COURT:  And what does -- once again, is it your

24   representation to this Court that you have some information, as

25   acquired through the investigation of these charges, that he

*Proceedings*

1    intended to meet someone in Mexico for purposes of

2    disseminating this classified information? because, otherwise,

3    it's a trip to Mexico.

4              MR. RODREGOUS:  Your Honor, the facts suggest, because

5    it's an ongoing investigation and more will certainly be

6    uncovered, an individual does not need to bring an Intelligence

7    Community credential with them.

8              THE COURT:  Which could lead to the reasonable

9    inference that he didn't know it was in his bags, kind of like

10   people who get on and say, Oh, forgot the gun.

11             MR. RODREGOUS:  You're right, Your Honor, if it was

12   just the credential.

13             THE COURT:  So what, besides presumptions, are you

14   providing this Court to make its decision?

15             MR. RODREGOUS:  It's not every day, Your Honor, that

16   somebody brings a credential and classified material on a

17   flight out of the United States.

18             THE COURT:  Not every day that they're detained and

19   arrested for doing so.  You have presented no evidence to this

20   Court how often people attempt to do so or how often people

21   actually succeed in doing so.

22             MR. RODREGOUS:  Again, Your Honor, you're right, we

23   didn't, because our task is to --

24             THE COURT:  But it's your job to prove to this Court

25   the facts that support your argument for detention.  As of this

*Proceedings*

1    point in time, you have failed in your task.  Is there

2    additional information you'd like to provide the Court? because

3    your entire argument seems to be based on your position that is

4    a risk of nonappearance and a danger to the community.  So be

5    it.  Let's conclude he is.  That's not the standard that this

6    Court is required to consider in detaining or releasing him.

7    The standard is this Court must conclude there is no

8    combination of conditions that would reasonably assure his

9    appearance and the safety of the community.  So even if he is a

10   danger and a risk, he still should be released unless this

11   Court concludes that no combination of conditions will

12   reasonably -- not guaranty -- reasonably assure his appearance

13   and the safety of the community.  Why wouldn't the conditions

14   set forth in the Pretrial Services Report serve that purpose?

15           MR. RODREGOUS:  Because the conditions that are at

16   play here require a third-party custodian argument that has

17   been proffered and presented to this Court and show that

18   they're insufficient to overcome the flight risk; that the

19   facts of this case make clear he was attempting to flee the

20   United States with classified material.

21           THE COURT:  What is this -- you can't use the word

22   "flee"; that's an assumption.  He bought a ticket to go to

23   Mexico, he says, for vacation.  Do you have any information in

24   your possession that suggests he was not going to Mexico for

25   vacation?

*Proceedings*

1          MR. RODREGOUS:  Respectfully, Your Honor, you don't

2    need an Intelligence Community credential to go fishing, and

3    that's --

4          THE COURT:  And did he tell someone, I was bringing my

5    intelligence credentials with me to go fishing?

6          MR. RODREGOUS:  No, Your Honor.

7          THE COURT:  So then why are you making the connection

8    that he himself never made?

9          MR. RODREGOUS:  Because his purported explanation was

10   that he was going fishing.

11         THE COURT:  He didn't say, That's why I have the

12   documents.  He just said -- he wasn't explaining anything.  He

13   was explaining why he was on the flight:  Because I'm going

14   fishing.

15         MR. RODREGOUS:  Certainly, Your Honor.  And the

16   reality is his flight was scheduled to leave Friday; he was

17   scheduled to come back Wednesday; and if --

18         THE COURT:  Well, if I'm fleeing, why am I coming

19   back?  I get a one-way ticket.

20         MR. RODREGOUS:  If his only reason for going to Mexico

21   was fishing and -- the case -- the facts in this case are

22   distinct --

23         THE COURT:  No, no.  What's wrong with him -- if he's

24   only going to Mexico for fishing, what's wrong with that?

25   Finish the thought.

*Proceedings*

1      MR. RODREGOUS:  The argument that I've already made,

2  Your Honor:  He doesn't need an Intelligence Community

3  credential, and he certainly --

4      THE COURT:  And he didn't say he had it for that

5  purpose, so that argument fails.  What else you got?

6      MR. RODREGOUS:  He doesn't need classified

7  material on --

8      THE COURT:  He didn't say he was bringing it to go

9  fishing.  What else you got?

10     MR. RODREGOUS:  He doesn't have to, Your Honor.

11     THE COURT:  You're trying to say simply because he had

12 classified information, he obviously wasn't going fishing in

13 Mexico --

14     MR. RODREGOUS:  I'm arguing that that's not --

15     THE COURT:  -- and that's too far of a leap for this

16 Court to make.

17     MR. RODREGOUS:  It's not the only thing he was going

18 to do in Mexico.  And if he were fishing, then that doesn't

19 preclude him from doing other things.

20     THE COURT:  What else is he doing in Mexico?

21     MR. RODREGOUS:  Your Honor, I can't put myself into

22 his mind beyond --

23     THE COURT:  Then you have no facts to suggest he was

24 doing anything or going to do anything in Mexico except for his

25 stated purpose, do you?

*Proceedings*

1          MR. RODREGOUS:  I have documents that --

2          THE COURT:  It's your opinion as a prosecutor in this

3   case, and I wouldn't have thought you would have had any

4   different opinion.

5          MR. RODREGOUS:  Well, Your Honor, the facts are what

6   dictate the result.

7          THE COURT:  Exactly.  And the facts so far do not

8   support your request for detention.  You have any others?

9          MR. RODREGOUS:  Minor Court's indulgence.

10         (Whereupon, there was a brief pause in the proceedings.)

11         THE COURT:  Because from the Pretrial Services Report,

12   it appears Mr. Gun has no criminal history as well --

13         MR. RODREGOUS:  The only --

14         THE COURT:  -- so the danger to the community is the

15   charge itself --

16         MR. RODREGOUS:  That's right, Your Honor.

17         THE COURT:  -- and you don't believe that can be

18   addressed by any condition of release?

19         MR. RODREGOUS:  I don't, Your Honor.

20         THE COURT:  So, then, your position is that anyone

21   charged with this offense should be detained.

22         MR. RODREGOUS:  It is not, Your Honor.

23         THE COURT:  Then why should he?

24         MR. RODREGOUS:  Because if he is released, Your Honor,

25   there are ways that he can continue to share the information

*Proceedings*

1      that is stored in his head.

2              THE COURT:  Anyone charged with this offense could do

3      the same if they still had any of it in its possession.  Do you

4      have information that would suggest to this Court -- since the

5      information was seized, do you have any information that

6      suggests that your experienced, competent law enforcement

7      personnel didn't seize at all?

8              MR. RODREGOUS:  Your Honor, there is --

9              THE COURT:  Put it an easier way:  Do you have any

10     information in your possession that suggests that Mr. Gun still

11     has any classified documents in his possession?

12             MR. RODREGOUS:  Your Honor, I --

13             THE COURT:  Yes or no?

14             MR. RODREGOUS:  I cannot go into that because of the

15     national security implications, Your Honor, but I can say --

16             THE COURT:  Then you have to take the consequences.

17     Facts are facts.  The Court completely understands your ability

18     and inability to discuss certain things --

19             MR. RODREGOUS:  What I can say, Your Honor --

20             THE COURT:  -- but you do so at your own peril.  You

21     cannot have it both ways.  This Court cannot make a decision

22     based on information that you are unwilling to provide, for

23     whatever reason.  This Court makes decisions based on facts,

24     not the absence of said.

25             MR. RODREGOUS:  Understood, Your Honor.  I guess the

1    final point I would make in line with the Court's most recent

2    comment is that this involves documents of extremely high

3    classification, and I will end where I began:  This is not a

4    situation where it's an unwitting defendant who made a mistake,

5    which was an anecdote that the Court provided --

6         THE COURT:  Do you have any information -- well, let's

7    try to do it easier.  There have been plenty of people who have

8    been charged with this offense who had classified information

9    just as significant, if not more significant, and were released

10   pretrial.  What, once again, factually, makes this case so

11   egregious that he should also not be released, especially when

12   a big part of your argument is danger to the community and he

13   has no criminal history --

14        MR. RODREGOUS:  Your Honor, it's because --

15        THE COURT:  -- and you have no evidence to present to

16   this Court that he disseminated any classified information or

17   intended to do so?  So, right now, you have the simple

18   possession of classified information, and you don't think

19   simple possession of classified information can be dealt with

20   with any combination of release conditions?

21        MR. RODREGOUS:  Your Honor, I would oppose the simple

22   characterization given the volume in this case.

23        THE COURT:  It doesn't make a difference what you

24   characterize it as; it's this Court's characterization that's

25   important.

*Proceedings*

1          MR. RODREGOUS:  Your Honor, there isn't any condition

2      that is going to prevent the defendant from speaking about what

3      he knows.

4          THE COURT:  And where in the law is it required for

5      that to be presented?  There are no guarantees of anything.

6      That's why the statute and the regulations say "reasonably

7      assure."

8          MR. RODREGOUS:  There is a guarantee that if he is

9      detained, he will not be able to have those types of

10     conversations --

11         THE COURT:  That's with every defendant.

12         MR. RODREGOUS:  -- that he would be free to have if

13     released, Your Honor.

14         THE COURT:  If detained, he would no longer steal

15     government property.  If detained, he would no longer possess

16     child pornography.  If detained, he can no longer do much of

17     anything.  And, in fact, that actually isn't true because

18     experience proves that internet-capable phones have inhabited

19     incarceration facilities in the past, and probably will in the

20     future.  Said access to the internet provides a means by which

21     to continue to commit the crime, so your representation was

22     inaccurate.

23         MR. RODREGOUS:  It would reasonably assure Your Honor,

24     which is the standard.  I didn't -- I never argued it would

25     eliminate, nor does the statute require that.  It requires that

*Proceedings*

1    it would be reasonably assured that these things would not

2    happen, and that is the way to reasonably --

3            THE COURT:  So your argument is we should detain

4    everyone because detention would reasonably assure that the

5    person detained would not continue to violate the law, right?

6            MR. RODREGOUS:  No, Your Honor.  This is all attendant

7    to Mr. Gun, and a case-by-case basis as everyone --

8            THE COURT:  But you have not specified your argument

9    concerning Mr. Gun's conduct.  The only thing you've informed

10   this Court is he possessed classified information on a flight

11   to Mexico -- or before boarding the flight to Mexico.  That's

12   what you've given me factually.  And you're saying to this

13   Court that there is no combination of conditions of release to

14   address that.

15           MR. RODREGOUS:  That is our argument, Your Honor.

16           My final point unrelated to that argument is to say

17   that the Pretrial Services Report's score calculation, the

18   United States would urge the Court to place no reliance upon it

19   because the factors that are contemplated in what composed that

20   score --

21           THE COURT:  No reliance?  But I thought you made it

22   clear that the Court is required to consider all factors --

23           MR. RODREGOUS:  Not on the score --

24           THE COURT:  -- in determining whether release or

25   detention is appropriate.

1      MR. RODREGOUS:  Not with respect to the score tool,

2   Your Honor, which is not a 3142(g) factor.  So I want to parse

3   the two.  One is contained within the Pretrial Services Report;

4   the other is by statute.  And the one that's within the

5   Pretrial Services Report contains a litany of factors that give

6   a potential benefit to first-time offenders that don't fully

7   capture the seriousness of the offense; and for that reason,

8   and that reason alone, on that factor, on that tool alone,

9   Your Honor, we would urge the Court to give it little, if no,

10  weight.

11      And beyond that, I have no further argument, and I

12  appreciate the Court's indulgence.  Thank you.

13      MR. BARBARI:  Thank you, Your Honor, and good

14  afternoon again.  Rammi Barbari for Mr. Gun.

15      Judge, I would respectfully request that Your Honor

16  follow the recommendation of Pretrial and release Mr. Gun to

17  the third-party custodian and in accordance with the

18  conditions --

19      THE COURT:  To what third-party custodian?

20      MR. BARBARI:  To Beatrice Yazgan, Your Honor, his

21  girlfriend that lives in Reston, Virginia, and she is present

22  in the courtroom today, Your Honor.

23      And I'll tell the Court --

24      THE COURT:  Now, who was the individual -- was that

25  not the individual who was going on the trip?  This is the

*Proceedings*

 1     individual who said they weren't willing to put up their

 2     residence?

 3              MR. BARBARI:  That's correct, Your Honor.  And there

 4     is a trip scheduled -- not -- there is a trip scheduled to, I

 5     believe, New York later this week, and she is set to return

 6     Sunday, and so we would not be asking for his release to that

 7     third-party custodian until she returns from that trip -- we

 8     understand that, Your Honor -- if Your Honor is going to

 9     consider release.

10              THE COURT:  And what does the Court do in the interim?

11              MR. BARBARI:  Your Honor --

12              THE COURT:  Because if the Court believed that a

13     third-party custodian was appropriate to reasonably assure his

14     appearance, the lack of one for those several days...

15              MR. BARBARI:  We understand that, Your Honor, and I

16     understand that Pretrial is recommending he not actually be

17     released from custody until then, Your Honor.  And I've

18     discussed that with Mr. Gun.  And it's our understanding that

19     he would potentially be released to her residence and be

20     allowed to live with her.  He understands that he may be

21     detained until that time, Your Honor.

22              And, Judge, I just wanted to touch base as well on

23     just some of the other conditions, Your Honor.  Mr. Gun

24     obviously would submit to electronic monitoring and home

25     confinement, if necessary.  Your Honor, there are a variety of

1    those conditions that I think would assure the Court and

2    alleviate the Court's concerns and the government's concerns of

3    dangerousness and risk of flight.  I think Your Honor, you

4    know, already pointed out he has no criminal history.  He's

5    50 years old, Your Honor.  He is a United States citizen,

6    although he does hold dual citizenship.  My understanding is

7    that he no longer has possession of the passports, the Turkish

8    expired one nor the United States passport, as I believe they

9    were taken during the search warrant, and so he does not and

10   would not have a way to leave the country or this area.

11          THE COURT:  Now, I was unclear, because it wasn't

12   mentioned in anything, whether or not Turkey authorizes dual

13   citizenship.

14          MR. BARBARI:  I do not know, Your Honor.

15          THE COURT:  You don't know?

16          MR. BARBARI:  I do not know.  I could ask Mr. Gun if

17   he knows if he has current Turkey citizenship if Your Honor --

18          THE COURT:  Well, it appeared, based on the

19   information in the Court's possession --

20          MR. BARBARI:  Yes, Your Honor.

21          THE COURT:  -- he was unclear; that's why I was asking

22   counsel.

23          MR. BARBARI:  Understood, Your Honor.  I'm sorry, I do

24   not know the answer to that.

25          THE COURT:  Understood.

1          MR. BARBARI:  And, Your Honor, he does -- the

2     government makes a point that he owns properties in Texas and

3     Florida, but as Your Honor pointed out, he does own properties

4     here in Fairfax.  And I wanted to just tell the Court, in terms

5     of the ties to the community --

6          THE COURT:  What is with the property in Texas?  Does

7     he have a mortgage on that as well?

8          MR. BARBARI:  I'm not sure if he has a mortgage on

9     that, Your Honor.  I can ask him, if Your Honor would indulge.

10        (Whereupon, there was a brief pause in the proceedings.)

11         MR. BARBARI:  There is a mortgage, Your Honor, and my

12    understanding is --

13         THE COURT:  Which home has the most equity?

14         MR. BARBARI:  I believe, from my understanding -- and

15    I can confirm with the client -- that it's the Fairfax home.

16        (Whereupon, there was a brief pause in the proceedings.)

17         MR. BARBARI:  Yes, Your Honor.

18         THE COURT:  Do we know approximately how much value or

19    equity is in that home?

20         MR. BARBARI:  Your Honor, if I could point to the

21    Pretrial Services Report, my understanding is that there is, I

22    think, an $80,000 mortgage left, and I believe the potential

23    value of that property, according to the Footnote 1 on page 3,

24    is about 498,000.  That would put approximately 420, give or

25    take, thousand dollars in equity in that home, I believe,

1        Your Honor.

2                THE COURT:  And is your client willing to put up that

3        property as a condition of release?

4                MR. BARBARI:  I have not discussed that with him,

5        Your Honor, but --

6                THE COURT:  Well, now would be the time.

7                MR. BARBARI:  Your Honor, Court's indulgence.

8            (Whereupon, there was a brief pause in the proceedings.)

9                MR. BARBARI:  I'm told that Mr. Gun would absolutely

10       be willing to put up that property as collateral, Your Honor.

11               THE COURT:  All right.

12               MR. BARBARI:  And I wanted to just tell the Court I

13       did speak with several of his friends who are in the area.  One

14       of the gentlemen has been a tenant of his at the Fairfax home

15       for, I think, several years, for quite some time, and has known

16       Mr. Gun in this area for the time that he's lived and worked in

17       this area.

18               And then another individual, Mr. Golden, who I spoke

19       with as well, who lives in the Ashburn Brambleton area, I've

20       arranged with him to be able to turn in any of the firearms,

21       even though, if released, he would not reside at his Falls

22       Church or Fairfax residence.  He does own firearms legally and

23       understands that it's usually a condition to surrender those.

24       And I've arranged with that individual, Mr. Golden, that he

25       would be willing to take ownership and property -- not

*Proceedings*

1   ownership, but property -- take possession -- excuse me -- of

2   those firearms in the interim and protect them so that he would

3   not have access to those as well, even though this isn't a

4   firearm case or anything like that.  So I wanted the Court to

5   just be aware of that, Your Honor.  So I would submit,

6   Your Honor, that he does have ties to the community.

7          And my understanding is that his sister, who I believe

8   is his only sibling, used to live in Sterling, Virginia, but

9   she passed away, I believe, two years ago from cancer.  So he

10  does not have any, I believe, living siblings here in the

11  United States.  And his parents do reside in Turkey, who, it's

12  clear, he did visit -- you know, has visited throughout the

13  years while he was in the states and visited them back home in

14  Turkey.  So I don't believe there is any other family that

15  actually lives in the United States, as far as I know,

16  Your Honor.

17          Court's brief indulgence, Your Honor.

18      (Whereupon, there was a brief pause in the proceedings.)

19          MR. BARBARI:  And so I don't want to repeat

20  everything, Your Honor.  I think Your Honor pointed out a lot

21  of the issues on the factual.  If Your Honor wants me to get

22  into that, I can, but --

23          THE COURT:  That's fine.  I think you're right, the

24  Court has covered it ad nauseam, probably.

25          MR. BARBARI:  Understood, Your Honor.  So I don't want

*Proceedings*

1    to repeat that, but I would just submit that, you know, the

2    assumption the government makes, I was going to make all of

3    those arguments, that Your Honor did point out, to the Court

4    for why detention would not be appropriate, and that there are

5    a combination of conditions that would be appropriate for his

6    release into the community, Your Honor.

7              THE COURT:  Thank you.

8              Based on his lack of criminal history, the lack of any

9    factual information that suggests at this -- not suggests --

10   from which this Court could conclude that Mr. Gun did anything

11   at this juncture but to have unauthorized -- or removed without

12   authority and retained classified material, the lack of any

13   criminal history, the fact that he has a third-party custodian,

14   this Court does believe there is a combination of conditions of

15   release that would reasonably assure Mr. Gun's appearance at

16   future court proceedings and the safety of the community, those

17   being the eight conditions set forth on page 6 of the Pretrial

18   Services Report, with the additional condition that he will not

19   be released until this Court has acquired documentation or

20   proof from the individual represented by defense counsel that

21   the firearms have been removed and are retained by said

22   individual outside of the homes owned by Mr. Gun.

23             Does the government believe there are any other

24   conditions of release that are appropriate?

25             MR. RODREGOUS:  Yes, Your Honor.  The United States

1   would move for GPS monitoring and home confinement as

2   additional conditions.

3           THE COURT:  Counsel?

4           MR. BARBARI:  Your Honor, I think that the GPS

5   monitoring would be appropriate.  I did represent that he would

6   be willing to do home confinement if Your Honor thought that

7   was appropriate, but I would not ask for that, Your Honor.

8           THE COURT:  GPS monitoring -- home detention with GPS

9   monitoring with time-outs as directed by Probation or by

10  Pretrial Services will also be a condition of supervision.

11          MR. RODREGOUS:  Your Honor, at this time, the United

12  States would move to stay the detention order, and we have a

13  proposed order for the Court as well as for defense counsel --

14          THE COURT:  All right.

15          MR. RODREGOUS:  -- pending appeal to the district

16  court in this case.

17          THE COURT:  And the government will keep the Court

18  informed of the status of any said appeal if, obviously, that

19  information is not contained in ECF notifications.

20          MR. RODREGOUS:  Absolutely, Your Honor.

21          THE COURT:  Anything further?

22          MR. BARBARI:  No, Your Honor.

23          MR. RODREGOUS:  Nothing further, Your Honor.

24          THE COURT:  It appearing nothing further, Mr. Gun is

25  remanded to the custody of the United States Marshal pending

1    further proceedings.

2

3                      CERTIFICATE OF REPORTER

4             I, Diane Salters, hereby certify that the foregoing

5    transcript of proceedings was prepared from an FTR Gold audio

6    recording of proceedings in the above-entitled matter and was

7    produced to the best of my ability.  Indiscernible indications

8    in the transcript indicate that the audio captured was not

9    clear enough to attest to its accuracy.

10

11                               /s/ Diane Salters

12                         _____

13                         Diane Salters, CSR, RCR, RPR
                           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25